1 | Jaime W. Marquart (State Bar No. 200344)
2 |   jmarquart@bmchlaw.com
3 | BAKER MARQUART CRONE & HAWXHURST LLP
  10990 Wilshire Blvd., Fourth Floor
  Los Angeles, California 90024
4 | Telephone: (310) 575-3800
  Facsimile: (310) 575-3802

FILED
CLERK, U.S DISTRICT COURT

OCT 22 2007

CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

ENTERED
CLERK, U S DISTRICT COURT

OCT 23 2007

CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALBERT M. ZLOTNICK, an individual,<br><br>              Plaintiff,<br><br>vs.<br><br>COAST CAPITAL PARTNERS, LLC, and DOES 1 through 50, inclusive,<br><br>              Defendants. | Case No.  CV07-783R (JTLx)<br><br>Hon. Manuel L. Real<br><br>**STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF COAST CAPITAL PARTNERS, LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Local Rule 56-1]<br><br>Date:    October 15, 2007<br>Time:    10:00 a.m. |

    Defendant Coast Capital Partners, LLC ("CCP"), pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 56-1, submits this Statement of Uncontroverted Facts and Conclusions of Law in support of their Motion for Summary Judgment against Albert Zlotnick ("Zlotnick").

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d).

DOCKETED ON CM

OCT 23 2007

BY      004

54

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

# I.

## UNCONTROVERTED MATERIAL FACTS

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1. CCP is a hard-money secured lender based in New Jersey. Its primary business model is to extend mostly senior, fully-secured loans to troubled or transitional businesses at relatively high interest rates. | Declaration of Walter Craig, filed concurrently herewith ("Craig Dec."), ¶ 2. |
| 2. In or around March, 2000, CCP began lending money to various movie production and distribution entities controlled by Charles Band ("Band"), a Los Angeles producer of horror films. The entities controlled by Band ("Band Entities") include, among others, Full Moon Universe, Inc. (two distinct entities by that name, one based in California and the other in Washington), iSurrender.com, and Shadow Entertainment. | Craig Dec., ¶ 3. |
| 3. The original March 2000 loan agreement between CCP and Full Moon Universe was amended over time, and CCP also made additional loans to other Band Entities such as Shadow Entertainment over time. | Craig Dec., ¶ 3. |

| | |
|---|---|
| 4. Essentially all of CCP's loans to Band Entities were secured by all of the assets of the Band Entities. | Craig Dec., ¶ 3. |
| 5. CCP's loans to the Band Entities were also personally guaranteed by Band from their inception which guaranty was secured by real estate owed by Band. | Craig Dec., ¶ 3. |
| 6. CCP recorded its senior liens by filing UCC financing statements with the California Secretary of State as well as copyright mortgages against the films. | Craig Dec., ¶ 4. |
| 7. The Band Entities ultimately defaulted on the loans to CCP, and CCP obtained a judgment of $2.3 million against the Band Entities in Coast Capital Partners, LLC, et al. v. Full Moon Universe, Inc., et al., Superior Court of New Jersey (Monmouth County) Case No. L-4206-05. | Craig Dec., ¶ 5. |
| 8. Shortly after CCP began making loans to the Band Entities, plaintiff Albert Zlotnick ("Zlotnick") and Band contemplated a sophisticated reverse merger transaction in which one of Band's companies, iSurrender.com, would merge with a public | Zlotnick's First Amended Complaint in Los Angeles Superior Court Case No. BC262183 ("Band FAC"), dated May 1, 2002, ¶¶ 14-16, attached as Ex. B to |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| shell corporation provided by Zlotnick, to form a production company with access to the public capital markets. | CCP's Request for Judicial Notice filed concurrently herewith. |
| 9.  As of 2000, Zlotnick was an experienced investor with approximately forty-three years of experience in investment banking, and had conducted approximately fifty corporate finance transactions. | Deposition of Albert M. Zlotnick dated July 27, 2007 ("Zlotnick Tr.") at pp. 19:4-12; 27:10-13, Declaration of Jaime Marquart ("Marquart Dec."), Ex. B at 33, 35. |
| 10.  As part of the reverse merger scheme, Zlotnick agreed to provide bridge loans to certain of the Band Entities. | Band FAC ¶¶ 14-16, CCP's Request for Judicial Notice Ex. B. |
| 11.  Zlotnick testified that shortly after lending certain of the Band Entities approximately $1.5 million, he learned of the CCP loan.  At such time, Zlotnick testified that his only knowledge of CCP came from Band, whom Zlotnick had started to distrust, because Band "wasn't living up to his previous assertions and promises." | Zlotnick Tr. at pp. 46:11-47:15; 67:15-25; 236:7-9, Marquart Dec., Ex. B at 36-37, 49, 72. |
| 12.  In fact, Zlotnick testified that his discovery of the CCP loan was one of the | Zlotnick Tr. at pp. 49:7-50:3, Marquart Dec. Ex. B |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| things that caused him "to question Mr. Band's integrity." | at 37A and 37B. |
| 13.  Zlotnick concedes that CCP's liens on Band Entity assets are senior to his own. | Final Pretrial Conference Order  dated September 10, 2007 at p. 6:15-19, Marquart Dec. Ex. C at 126. |
| 14.  On January 22, 2001, Zlotnick's counsel sent a memorandum to Zlotnick attaching various financial statements.  The memorandum stated: "[w]ith regard to your knowledge of the Coast Capital Partners secured loan, there is no specific reference in the Share Exchange Agreement or the Promissory Note as to whether or not the loan is secured." | Deposition of James McShane dated August 15, 2007 ("McShane Tr.") at pp. 28:4-24 and Ex. 64 thereto, Marquart Dec. Ex. E at 212, 265. |
| 15.  On or about June 11, 2001, Zlotnick's counsel sent a memorandum to Zlotnick regarding additional security agreements between Zlotnick and the Band Entities wherein he noted that the new agreements "indicate[] that in addition to acknowledging the Coast Capital Security Agreement that | Zlotnick Tr. at pp. 241:17-242:22 and Ex. 49 thereto, Marquart Dec. Ex. B at 73-74, 103. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| you contest its validity." | |
| 16.  On or about April 3, 2001, Mickey Kaiserman, one of Band's employees, faxed a memo to Zlotnick regarding the CCP loan. The memo attached more financial statements, and stated that "during due diligence, I had copies of the Coast Capital Agreements in a binder for Greg Lipsker [Zlotnick's lawyer] to review." | Zlotnick Tr. at pp. 223:9-226:9 and Ex. 44 at 5405, Marquart Dec. Ex. B at 68-71, 79. |
| 17.  The April 3, 2001 Kaiserman memo also provided a chronology of the CCP loan agreements, explicitly listing the following:<br><br>(1) the original CCP loan agreement with Full Moon Universe, dated March 16, 2000;<br><br>(2) CCP's consent to the Zlotnick loans of $1.5 million (which expressly states that CCP's loan is superior to Zlotnick's); and<br><br>(3) a January 16, 20001 draft agreement (which extended the payment terms and contemplated CCP loaning additional amounts). | *Id.* |

| | |
|---|---|
| 18. Zlotnick alleges that sometime in 2000 or 2001, a conference was held between him, Band, and Walter Craig of CCP. | Zlotnick's Response to Interrogatory No. 1, p. 3:13-15, Marquart Dec., Ex. D at 168. |
| 19. Zlotnick contends that the conference call happened just after he had already loaned various Band Entities at least $1.5 million. | Final Pretrial Conference Order dated September 10, 2007 at p. 2:23-27 Marquart Dec. Ex. C at 122. (stipulated fact.) |
| 20. Neither Craig nor Band recall the alleged conference call ever taking place. | Craig Dec., ¶ 7; Declaration of Charles Band dated August 10, 2007, Marquart Dec. Ex. H at 484. |
| 21. Zlotnick alleges that during the conference call in 2000 or 2001, Craig, on behalf of CCP, made the following representations:<br><br>(1) CCP stated that Zlotnick was "in pretty good shape" with his loan, although Zlotnick testified he felt this statement was more one of "opinion" than fact, and described it as "flowery talk." More | Zlotnick's Response to Interrogatory No. 7 at p. 7:8-24, Marquart Dec. Ex. D at 172; Zlotnick Tr. at pp. 55:3-64:23; 81:19-82:1; 84:17-85:7; 93:19-94:15; 97:18-98:6; 104:1-25; 106:5-25; 108:2-7; 130:4-23, Marquart Dec. Ex. B at 38-47, 54-55, 57-58, 59-60, |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| specifically, Zlotnick's discovery responses claim, "Mr. Craig validated or confirmed a statement from Mr. Band that Mr. Zlotnick's position was strong and that he had nothing to worry about from [CCP's] lien position." | 61-62, 63, 64, 65, 67; Zlotnick's Complaint in this matter dated December 8, 2006 ("Complaint"), ¶ 7, Marquart Ex. G at 473; Final Pretrial Conference Order dated September 10, 2007 at pp. 3:23-4:1, Marquart Dec. Ex. C at 123. |
| (2) CCP stated that there were "sufficient assets to cover both Mr. Zlotnick and CCP." | |
| (3) CCP stated that its first-priority loan of approximately $503,000 would be paid down by Band at the rate of approximately $50,000 per month, and would thus be paid off in about ten months, at which time Zlotnick's loan would be in the "stronger position;" | |
| 22.  Zlotnick testified that he and CCP never entered into any agreement, either written or oral, during or after the conference call. | Zlotnick Tr. at pp. 78:17-79:7, Marquart Dec. Ex. B at 53-53. |
| 23.  Zlotnick claims that his total investment in the Band Entities was approximately $2.3 million. Zlontick's response to Interrogatory | Zlotnick Tr. at pp. 24:2-4, Marquart Dec. Ex. B at 34; Zlotnick's Response to |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| No. 31 states "Mr. Zlotnick believes that the loans or financial statements he made after that conversation [the alleged 2000 or 2001 phone call among Zlotnick, Band and Craig] were between $520,000 and $870,000." | Interrogatory No. 31, Marquart Dec. Ex. F at 466-467. |
| 24. In deposition, Zlotnick testified that he could not recall whether Mr. Craig stated that the CCP loan would not be re-advanced during the call. | Zlotnick Tr. at pp. 129:9-12, Marquart Dec. Ex. B at 66. |
| 25. Zlotnick continues to assert the following three "claims" against CCP, all of which are premised upon the same alleged misrepresentations: (1) for fraud based upon the three alleged misrepresentations; (2) for subordination in equity based upon the factual predicate of the three alleged misrepresentations; and (3) for negligent misrepresentation based upon the three alleged misrepresentations. | Final Pretrial Conference Order dated September 10, 2007, ¶7(a)-7(c) at 3:15-7:25, Marquart Dec. Ex. C. at 123-127. |
| 26. Shortly after the alleged conference call with CCP, Zlotnick learned that, contrary to Craig's purported representations, the CCP loan balance was actually remaining the same or increasing over time, rather than steadily | Zltonick Tr. at pp. 64:13-66:7, Marquart Dec. Ex. B at 47. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| decreasing. | |
| 27.  Zlotnick regularly received financial statements from mid-2000 to at least mid-2001 disclosing that CCP's loan balances with Full Moon Universe were staying the same or increasing over time. | August 14, 2002 Deposition of Albert M. Zlotnick in Case No. 262183 at pp. 243:19-244:5, 244:20-246:16, 248:2-25; Exhibits 11, 12 and 14 thereto, Marquart Dec. Ex. I at 488-493, 502, 512, 522; Zlotnick Tr. at pp. 251:20-252:18, Exs. 48 and 50 thereto, Marquart Dec. Ex. B at 75-76, 100, 115. |
| 28.  At deposition, Zlotnick testified he learned it was *not* true that CCP's loan would be paid off in ten months merely "several months or a month" after the conference call, and that he certainly learned this fact during or before 2001. | Zlotnick Tr. at pp. 73:5-74:12, Marquart Dec. Ex. B at 50-51. |
| 29.  On January 16, 2001, Band sent Zlotnick's counsel, Gregory Lipsker of Workland & Witherspoon, a draft of a proposed agreement stating that the CCP loan | McShane Tr. at pp. 19:2-25:8 and Ex. 62 thereto, Marquart Dec. Ex. E at |

- 10 -

| | |
|---|---|
| "may be increased from time to time up to a maximum amount" of $700,000. | 203-209, 250. |
| 30.  Zlotnick's counsel in Los Angeles Superior Court Case No. BC262183 (the "Band Litigation"), Jim McShane, admitted that the January 16, 2001 memo from Band to Lipsker was produced to him more than three years prior to this action being filed and, in fact, questioned Mr. Lipsker about the document at his deposition in that matter.  Mr. Lipsker authenticated the memo. | *Id.* |
| 31.  On November 19, 2002, Zlotnick's counsel in the Band Litigation sent a letter to counsel for the Band Entities stating:<br><br>"We received the information requested on the status of the Coast Capital loan.  It appears that the balance due is over $563,000." | Zlotnick Tr. at pp. 257:3-258:14 and Ex. 52 thereto, Marquart Dec. Ex. B at 77-78, 118. |
| 32.  A handwritten checkmark appears next to the above-quoted paragraph.  Zlotnick testified as follows:<br><br>Q:  And I want to point you to the second check mark from the bottom. | *Id.* |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| A:  Yes.<br><br>Q:  You can read for the record.  Is that your check mark?<br><br>A:  Yes.<br><br>Q:  Okay.  Reading the record next to the right of the second check mark, quote:<br><br>"We received the information requested on the status of the Coast Capital loan.  It appears that the balance due is over 563,000 dollars."  Do you see that, Sir?<br><br>A:  Yes, I do.<br><br>Q:  That statement is inconsistent with your understanding of what Mr. Craig told you in the conference call, that the Coast Capital loan would only go down; is that correct?<br><br>A:  Correct. | |
| 33.  In October 2000, Zlotnick received a set of financial documents for Full Moon Universe which disclosed an interest rate of | August 14, 2002<br>Deposition of Albert M.<br>Zlotnick in Case No. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| 20-24% for the CCP loan. | 262183 at pp. 248:8-25 and Ex. 14 thereto at ZL0278; Marquart Dec. Ex. I at 493, 522. |
| 34.  On November 20, 2001, Zlotnick commenced the Band Litigation.  Paragraph 127 of his First Amended Complaint in that action states:<br><br>"Plaintiff is informed and believes and on that basis alleges that at all material times iSurrender, Full Moon California and Full Moon Washington had liabilities in excess of their assets, that they were unable to pay their debts as they became due in the ordinary course of business, and that they were insolvent." | Band FAC, ¶ 127, CCP's Request for Judicial Notice Ex. B. |
| 35.  Numerous documents were produced to Zlotnick's litigation counsel in connection with the Band Litigation at least three years prior to this lawsuit.  These included: (1) all of the loan documents and amendments between CCP and the Band Entities and (2) correspondence between Zlotnick's counsel | McShane Tr. at pp. 14:2-15:15; 17:14-18:11; 26:5-27:7; 31:4-32:8; 32:12-33:9; 33:17-34:9; 34:14-35:9; 38:2-39:2; 57:1-58:4, and Exs. 61, 67-70, and 75 thereto, Marquart Dec. Ex. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| and Band or Kaiserman documenting CCP's loan agreements and UCC filings. (Facts Nos. 29-30.) According to Zlotnick's counsel in the Band Litigation, Jim McShane of Sheppard Mullin: (a) documents bearing Bates stamp prefixes of "WW" were produced to him by Workland and Witherspoon, most likely in the middle of 2002 but certainly prior to August 2003; (b) documents bearing Bates stamp prefixes of "ZL" were given to him from Zlotnick himself, also most likely in the middle of 2002 but certainly prior to August 2003; and, (c) those bearing Bates stamp prefixes of "CB" were produced by Band to him on or before Band's deposition in April 2003. | E at 198-199, 201-202, 210-211, 215-219, 222-223, 238-239. |
| 36. According to Zlotnick's counsel in the Band Litigation, the aforementioned documents were most likely produced sometime in the middle of 2002, but certainly prior to August, 2003. | McShane Tr. at pp. 14:2-17:7, 19:5-23:25; 26:5-27:7; 38:2-39:2, Marquart Dec. Ex. E at 198-201, 203-207, 210-211, 222-223. |
| 37. Zlotnick was deposed in the Band Litigation in or around August, 2002. At such time, he testified that he was already aware of | August 14, 2002 Deposition of Albert M. Zlotnick in Case No. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

the "revolving" nature of the CCP loan:

A:... I recall, and I don't know if it was then or maybe a little bit later, there was a statement put out that Coast Capital was owed approximately $503,000.

Q: Okay.

A: There was a footnote to that statement saying that... Full Moon will repay that loan to the extent of either 50,000 a month, something like that.

Q: Right.

A: And I wanted to be reassured by Charlie that that was happening, and it was an absolute footnote that the company entered into.

Q: That the company was paying back the Coast Capital –

A: 50,000 a month. As I learned later on, they paid it back and took it out again.

262183 at pp. 314:10-315:3, Marquart Dec. Ex. I at 495-496.

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| Q: They paid it back and took it out.again.<br><br>A: Yeah. | |
| 38. On April 24 and 25, 2003, Zlotnick's counsel in the Band Litigation deposed Band on the issue of CCP's loans.  With Zlotnick present, Band explained that, in addition to the approximate $500,000 loan to Full Moon Universe, CCP had also made loans to other entities controlled by Band, such as Shadow Entertainment (which loan had a "face amount" that Band estimated at $800,000 to $900,000).  Band noted that these loans were personally guaranteed and secured by a mortgage on his Italian castle.  To clarify, counsel asked Band, "Just so I'm clear, that 8- or $900,000 is separate from and in addition to the $500,000. . .loan that was made to Full Moon?"  Band responded, "Correct." | Deposition of Charles Band dated April 25, 2003 at pp. 3:9, 89:4-90:11, Marquart Dec. Ex. J at 527, 529-530; McShane Tr. at pp. 42:2-43:11, Marquart Dec. Ex. E at 226-227. |
| 39. In its November 19, 2002 letter to opposing counsel in the Band Litigation, Zlotnick's counsel also asked for various financial information regarding Shadow Entertainment and, on December 16, 2002, opposing counsel provided detailed bank | McShane Tr. at pp. 44:10-45:23 and Ex. 72 thereto, Marquart Dec. Ex. E at 228-229, 313-343. |

- 16 -

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| statements for both Full Moon Universe and Shadow Entertainment. | |
| 40.  On or before September 3, 2003, Zlotnick's counsel in the Band Litigation compiled a separate file dedicated to the CCP loan transactions, containing copies of all the CCP loan documents and amendments thereto. | McShane Tr. at pp. 57:1-58:5 and Ex. 75 thereto, Marquart Dec. Ex. E at 238-239, 344-462. |
| 41.  In or around August, 2003, the Band Litigation settled when Band stipulated to a $2 million judgment in favor of Zlotnick. | McShane Tr. at pp. 10:10-12:10 and Ex. 58 thereto, Marquart Dec. Ex. E at 194-196, 240. |
| 42.  On or about April 30, 2004, Zlotnick sued Workland & Witherspoon, his transactional counsel in connection with his loan to the Band Entities. | Complaint against Workland & Witherspoon in Case No. CV-04-0140-AAM dated April 30, 2004, CCP's Request for Judicial Notice Ex. C. |
| 43.  Zlotnick's complaint against Workland & Witherspoon alleged, among other things, that the firm had committed malpractice by failing to identify prior obligations of the Band Entities from predecessor creditors and failing | *Id.*, ¶ 3 (at ¶ 17). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| properly to secure Zlotnick's loans. | |
| 44.  Zlotnick's complaint against Workland & Witherspoon further alleged that as a result of the firm's malpractice, Zlotnick's judgment against Band in the Band Litigation was "uncollectible," and that as a result, Zlotnick had to "seek the full amount of his damages from the Workland & Witherspoon defendants in order to make himself whole." | *Id.*, ¶ 3 (at ¶¶ 26, 26, and 31). |
| 45.  Zlotnick settled with the Workland & Witherspoon defendants for $1.4 million. | Zlotnick's August 14, 2007 Responses to CCP's Second Set of Interrogatories, Response to Interrogatory No. 27, Marquart Dec. Ex. F at 465. |
| 46.  In connection with Zlotnick's suit against Workland & Witherspoon, CCP was asked to produce documents and Craig was deposed in 2005.  CCP complied with both requests, making all of its files available in the manner in which they were maintained prior to Craig's deposition.  One of the documents produced was a memorandum from Craig to | Craig Dec. ¶ 7; Deposition of Walter Craig dated July 25, 2007 ("Craig Tr.") at pp. 88:5-19 and Exs. 8 and 9 thereto, Marquart Dec. Ex. A at 7, 25-28. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| Band, dated January 22, 2001. | |
| 47.  The January 22, 2001 memo from Craig to Band was in response to a request from Band to loan an additional $200,000 to Full Moon Universe. | Craig Tr. at pp. 88:23-90:18 and Exs. 8 and 9 thereto, Marquart Dec. Ex. A at 7-9, 25-28. |
| 48.  The memorandum proposed that if Zlotnick consented to the additional loan, CCP would agree to subordinate $100,000 of the additional loans to Zlotnick's loans.  In addition, Craig proposed that Zlotnick loan Full Moon Universe an additional $50,000, which would be on a *pari-passu* basis with another $50,000 loan by Zlotnick. | Craig Tr. at pp. 93:15-94:22 and Exs. 8 and 9 thereto, Marquart Dec. Ex. A at 13-14, 25-28. |
| 49.  A draft letter agreement setting forth these terms was attached to the January 22, 2001 memo.  This letter agreement was never agreed to. | Craig Tr. at pp. 101:6-102:7 and Exs. 8 and 9 thereto, Marquart Dec., Ex. A at 21-22, 25-28. |
| 50.  The January 22, 2001 memorandum also stated:<br><br>"When you next speak with Al [Zlotnick], don't suggest at all that you have gotten CCP to provide additional funding.  Keep him | Exs. 8 and 9 to Craig Tr., Marquart Dec. Ex. A at 25. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| thinking you are in desperate need of funding to meet immediate needs." | |
| 51.  Craig explained that he wrote the above-quoted language because CCP had not agreed to any additional funding at that point in time and it was, in that memo, important to him to make sure Mr. Band did not over-simplify to Mr. Zlotnick the problems and cash challenges Band and his companies were experiencing.  Craig did not want Mr. Band to give Mr. Zlotnick the impression that CCP's additional loans were already agreed to by all parties. | Craig Dec., ¶ 8. |
| 52.  The January 22, 2001 memo is the only document Zlotnick has identified as supporting his causes of action for fraudulent and/or negligent misrepresentation or his last claim for avoidance or subordination. | Zlotnick's Response to Interrogatory No. 12 at pp. 10:9-20, Marquart Dec., Ex. D at 175. |
| 53.  In his portion of the Pre-Trial Conference Order, Zlotnick contends that prior to learning about the existence of this memo, "Mr. Zlotnick had no reason to believe that Mr. Craig would intentionally misrepresent information to Mr. Zlotnick, nor that Mr. | Final Pretrial Conference Order dated September 10, 2007 at p. 7:21-23, Marquart Dec. Ex. C at 127. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Craig had intentionally and tortiously concealed information from Mr. Zlotnick." | |

## II.

## CONCLUSIONS OF LAW

### A. Zlotnick's Claims Are Time-Barred

1.        Zlotnick filed this action on December 8, 2006. On September 10, 2007, Zlotnick abandoned all of his claims except for (a) a fraud claim, (b) a request for "equitable" subordination or avoidance based upon the same fraudulent conduct, and (c) negligent misrepresentation based upon the same misrepresentations as his fraud claim. The maximum applicable statute of limitations for all of these claims is provided by California Code of Civil Procedure section 338(d), which sets a three-year limitations period for "[a]n action for relief on the ground of fraud or mistake." Caselaw establishes that the limitations period begins to run the moment "the plaintiff suspected or should have suspected that an injury was caused by wrongdoing." *Kline v. Turner*, 87 Cal. App. 4th 1369, 1374 (2001). *See also Snapp & Associates v. Malcolm Bruce Burlingame.Robertson*, 96 Cal. App. 4th 884, 891 (2002) ("...a *suspicion* of wrongdoing, coupled with a knowledge of the harm and its causes, commences the limitations period [emphasis in original]"); *Meadows v. Bicrodyne Corp.*, 785 F.2d 670, 672 (1986) ("[f]ailure to discover the details of the fraud does not prevent the statute from running"). Since Zlotnick was aware of his alleged injury and also aware that CCP's alleged representations were false *more* than three years prior to filing suit, and since Zlotnick actually accused another party, Charles Band, of making some or all of the

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

same misrepresentations as alleged herein against CCP more than four years prior to this lawsuit, his actions are time-barred.

2.     As it is predicated on a purported misrepresentation (Fact No. 25), Zlotnick's "equitable" subordination claim should similarly be barred by <u>Code of Civil Procedure</u> section 338's three-year statute of limitation.

## B. <u>Zlotnick Could Not Have Justifiably Relied on Any of CCP's Purported Misrepresentations</u>

1.     Zlotnick's negligent and intentional misrepresentation claims both include as elements that the plaintiff *justifiably* relied on a misrepresentation of material fact, to his detriment. *See Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239, fn. 4 (1995). Here, Zlotnick, a sophisticated investor with over forty years of investment banking experience, alleges that, based solely on Craig's alleged statements during the purported conference call, Zlotnick "advanced significant sums one [sic] or more Judgment Debtors." (Complaint, ¶ 49; Zlotnick Response to Interrogatory No. 9).

Whether a party's reliance on a particular statement or representation was justified "may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts." *Guido v. Koopman*, 1 Cal. App. 4th 837, 843 (1992). In determining whether reliance was justified, the plaintiff's "knowledge, education, and experience" must be considered. *Id.* at 844. Where sophisticated parties have engaged in complex business transactions, courts typically apply a stiffer threshold in determining whether reliance on a particular representation was justifiable under the circumstances. *See Pacific MDF Products, Inc. v. Bio-Mass Energy Concepts*, LLC, 2006 WL 3359211 (E.D. Cal. 2006) (CEO not entitled to rely on oral statements of other party during contract negotiations, where no

1   independent effort made to investigate claims); *General American Life Insurance*
2   *Co. v. Castonguay*, 984 F.2d 1518 (9th Cir. 1993) (plaintiff insurance company
3   could not justifiably rely on trust agent's assurances "that the trust was solvent but
4   that no financial statements were available," as plaintiff could have investigated
5   statement's veracity but did not do so). *See also Wilhelm v. Pray, Price, Williams*
6   *& Russell*, 186 Cal. App. 3d 1324, 1332  (1986) (unreasonable as a matter of law to
7   rely on representations of adversary's counsel without an independent inquiry).

8

9       2.       Although the legal theory underlying Zlotnick's avoidance cause of
10   action is unclear, it appears to be based on the same alleged fraudulent intent as his
11   misrepresentation claims.  (Complaint ¶ 29, 30 ("Plaintiff alleges that Defendants
12   and [Band Entities] entered into and engaged in a civil conspiracy to defraud
13   Plaintiff"), 31 ("such transfers were intentionally not disclosed or intentionally
14   concealed from Plaintiff"); Marquart Dec. Ex. 477-478).  Since Zlotnick's could
15   not have justifiably relied on any of CCP's alleged misrepresentations, his
16   avoidance claim fails for the same reasons.

17   **C.  Zlotnick Has No Evidence of Fraudulent Intent of Negligence**

18       Zlotnick's   only   proffered   evidence   of   intent    –   the   January   2001
19   memorandum from Craig to Band – does not as a matter of law raise any reasonable
20   inference that CCP *knowingly* or *negligently* made representations to Zlotnick,
21   required elements of each of Zlotnick's claims.

22       As the draft agreement attached to the memo explains, CCP was actually *not*
23   willing to loan significant additional funds unless and until Zlotnick made
24   additional loans, and that is why Craig did not want Band to suggest otherwise.
25   Craig has explained that he wrote the above-quoted language because CCP had not
26   agreed to any additional funding at that point in time and it was, in that memo,
27   important to him to make sure Mr. Band did not over-simplify to Mr. Zlotnick the
28   problems and cash challenges Band and his companies were experiencing.  (Fact

- 23 -

No. 51.) Craig did not want Mr. Band to give Mr. Zlotnick the impression that CCP's additional loans were already agreed to by all parties.  (Id.) Moreover, if anything, Craig was asking Band to present a more *negative* financial picture of the Band Entities, not the rosy one Zlotnick claims Craig "fraudulently" presented in the conference call.  In addition, the memo mentions that Craig was willing to suggest being in *pari passu* (in equal right of repayment) as to a small portion of the contemplated additional loans, contradicting any notion that CCP had ever previously suggested or agreed that it would subordinate any of its position.

Dated:    September 21, 2007

BAKER MARQUART CRONE & HAWXHURST LLP

By _____
Jaime W. Marquart
Attorneys for Defendant
Coast Capital Partners, LLC

IT IS SO ORDERED

DATE _____ Oct. 22, 2007

U.S. DISTRICT COURT JUDGE

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW